Sealed

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 19 · 24713 cv



Williams

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

v.

**NEIL BURKHOLZ, FRANK BIANCO,
PALM FINANCIAL MANAGEMENT, LLC,
AND SHORE MANAGEMENT SYSTEMS, LLC,**

**Defendants, and**

**RHODA BURKHOLZ AND SUZANNE BIANCO**

**Relief Defendants.**

_____/

```
FILED BY          D.C.

NOV 14 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI
```

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") for its

Complaint against Neil Burkholz ("Burkholz"), Frank Bianco ("Bianco"), Palm Financial

Management, LLC ("Palm Management"), and Shore Management Systems, LLC ("Shore

Management"), (collectively "Defendants"), and Relief Defendants Rhoda Burkholz and

Suzanne Bianco alleges as follows:

## SUMMARY OF THE ACTION

1.      Defendants Neil Burkholz and Frank Bianco are knowingly operating a fraudulent

investment scheme that, since at least 2014, has raised more than $6 million from at least 55

investors, many of whom are senior citizens.  To solicit and retain investors, Defendants falsely

represent that they are advisers and fiduciaries who will profitably manage investor assets.  In

reality, Defendants Bianco and Burkholz, through at least two investment management companies (Palm Management and Shore Management), knowingly misappropriate investor assets by diverting them to pay other investors and by transferring funds to themselves and their spouses. Defendants have invested less than half of the funds that they solicited, investments that have resulted in near-total losses caused by risky options trading.

2.      To conceal their misappropriation and trading losses, Defendants deliver false reports to investors showing that their assets have been fully and profitably invested. In these written and oral communications, Defendants mischaracterize their funds' performance – typically claiming massive weekly, monthly, and yearly positive returns – and omit that most investor funds have either been misappropriated or lost.

3.      In short, Defendants are operating a Ponzi scheme.

4.      Defendants' knowing misconduct is ongoing. They continue to seek investor funds on the basis of misrepresentations and deceptive acts, and they continue to divert investor assets to earlier investors and to their personal use. So far in 2019, they have raised over $1.49 million. In September, Defendants obtained $123,000 from a new 70-year old investor whose entire investment they promptly misappropriated.

5.      Through their fraudulent conduct, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Unless restrained and enjoined, Defendants are highly likely to engage in future violations of the federal securities laws.

6.      The Commission respectfully requests that the Court enjoin Defendants from committing further violations of the federal securities laws as alleged in the Complaint and order

Defendants to pay disgorgement, plus prejudgment interest, and a monetary penalty based upon these violations.

## JURISDICTION AND VENUE

7.　　This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Action [15 U.S.C. §§78u(d), 78u(e), and 78aa(a)].

8.　　This Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida because many of Defendants' acts and transactions constituting the violations of the Exchange Act occurred in the Southern District of Florida. Specifically, Bianco and Burkholz placed the trades and sent misleading communications from the principal place of business for Palm Management and Shore Management, which is in the Southern District of Florida. Burkholz and Bianco both also reside in the Southern District of Florida.

9.　　In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, and the mails. Among other things, Defendants have used email, the Internet, and bank wires to perpetrate their scheme.

## DEFENDANTS AND RELIEF DEFENDANTS

### A. Defendants

10.　　**Burkholz**, age 82, is a resident of Boca Raton, Florida. He is the Founder and co-CEO of Palm Management, and co-Founder and Manager of Shore Management. Burkholz and Bianco opened bank and brokerage accounts for Palm Management, Shore Management, and their investment funds. They are the only signatories on the bank accounts and they exercise exclusive trading authority over the brokerage accounts.

11.     **Bianco**, age 70, is a resident of Pembroke Pines, Florida.  He is co-CEO of Palm Management, and co-Founder and Manager of Shore Management.  Bianco and Burkholz opened bank and brokerage accounts for Palm Management, Shore Management, and their investment funds.  They are the only signatories on the bank accounts, and they exercise exclusive trading authority over the brokerage accounts.

12.     **Palm Management** is an active Florida limited liability company that Burkholz and Bianco formed in January 2014, with a principal place of business in Coconut Creek, Florida.  Bianco and Burkholz are the principals and managers for Palm Management, an entity that they claim manages an investment fund called Palm Financial Fund LLC ("Palm Fund"). Palm Management is not registered with the Commission in any capacity.

13.     **Shore Management** is an active Florida limited liability company that Bianco and Burkholz formed in May 2017, with a principal place of business in Coconut Creek, Florida. Bianco and Burkholz are the principals and managers for Shore Management, an entity they claim manages an investment fund called Shore Partners LLC ("Shore Fund").  Shore Management is not registered with the Commission in any capacity.

### B. Relief Defendants

14.     **Rhoda Burkholz**, age 77, is Neil Burkholz's wife and a resident of Boca Raton, Florida.  Rhoda Burkholz received at least $157,564 in investor proceeds from the securities fraud alleged herein for no consideration and without any legitimate claim to the funds.

15.     **Suzanne Bianco**, age 69, is Frank Bianco's wife and a resident of Pembroke Pines, Florida.  Suzanne Bianco received at least $55,727 in investor proceeds from the securities fraud alleged herein for no consideration and without any legitimate claim to the funds.

### C.  Other Relevant Entities

16.     **Palm Fund** is a Florida limited liability company that Defendants Burkholz and Bianco formed, according to its private placement memorandum, "for the purposes of managing a private investment fund that will be engaged in an investment strategy as to achieve an above-average rate of return by allocating its assets to a trading strategy that involves the buying and selling of ETF's and options."  Investors in the Palm Fund become "Members" with an "Interest" in the Palm Fund's assets and performance.  It is managed by Defendants Bianco and Burkholz, acting by and through Palm Management.  Specifically, the Palm Fund private placement memorandum states that Defendants Burkholz and Bianco are the "principals of the Manager" for the Palm Fund and will have "day-to-day control" of its operations.

17.     **Shore Fund** is a Florida limited liability company that Defendants Burkholz and Bianco formed, according to an offering summary they drafted, "to provide investors with short-term investment returns by utilizing sophisticated techniques in public securities markets such as stock options and index options."  Investors become "Members" who receive an "Interest" in the Shore Fund's assets and performance.  It is managed by Defendants Bianco and Burkholz, acting by and through Shore Management.  Specifically, according to the offering summary, Burkholz and Bianco will, on behalf of Shore Management, "manage the [Shore] Fund's day-to-day operations."

18.     **Wiles Systems, LLC** ("Wiles Systems") is a Florida limited liability company Defendants Bianco and Burkholz formed in July 2017.  Defendants Bianco and Burkholz are identified in Florida Division of Corporation records as the "Managers" of Wiles Systems.  As discussed further below, Bianco and Burkholz began using Wiles Systems to raise investor funds in May 2019.

### D. <u>Certain Victims</u>

19.    Investor 1 is a 69-year-old resident of Illinois.  In March 2019, he wired $25,000 to Palm Management with the expectation that it would be invested in the Shore Fund in a manner consistent with Defendants' representations in fund documents and other oral and written communications.

20.    Investor 2 is an approximately 77-year-old resident of Phuket, Thailand.  In April 2019, he wired $25,000 to Palm Management with the expectation that it would be invested in the Shore Fund in a manner consistent with Defendants' representations in fund documents and other oral and written communications.

21.    Investor 3 is a 65-year-old resident of Florida.  In January 2014, he entrusted $100,000 to Amazing Profits Groups, the predecessor to Palm Management, designating his payment as a "financial investment."  In August 2018, he entrusted another $130,000 to Palm Management, noting that the funds were his "house closing investment."

22.    Investor 4 is a 52-year-old resident of Maryland.  In October 2017, Investor 4 entrusted $249,000 to Palm Management, noting that the funds were related to a "401K investment."

23.    Investor 5 is a 74-year-old resident of Florida.  On seven occasions from March 2014 through September 2018, he provided a total of $139,000 to Palm Management believing that it would be, and had been, profitably invested, first in the Palm Fund, then in the Shore Fund.

24.    Investor 6 is a 60-year-old resident of Florida.  In 2015, he invested $100,000 with Palm Management with the expectation that it would be invested in the Palm Fund in a

manner consistent with Defendants' representations in fund documents and other oral and written communications.

25.    Investor 7 is a 77-year-old resident of Florida.  From May 2017 through May 2019, Investor 7 and his wife have invested $875,000 with Shore Management and the Shore Fund with the expectation that it would be invested in a manner consistent with Defendants' representations in fund documents and other oral and written communications.

26.    Investor 8 is a 77-year-old resident of Florida.  Between January 2014 and January 2016, she invested approximately $1.1 million– virtually her entire life savings – first with Amazing Profits Group, then with Palm Management and the Palm Fund.  Her communications with Defendants Bianco and Burkholz reflect her understanding that her money had been profitably invested.

## THE FRAUDULENT SCHEME

### *Defendants Falsely Claim To Operate Legitimate Investment Funds So They Can Solicit and Then Misappropriate Victim Assets*

27.    From at least 2014 through the present, Defendants have operated and continue to operate, from this district, what they claim to be legitimate investment management companies and investment funds through which they solicit funds, the majority of which they misappropriate in a Ponzi scheme or divert to their personal use.   During this time, through materially false statements, omissions, and deceptive devices, Defendants have solicited and obtained more than $6 million from at least 55 investor victims.  Most of that money is now gone, even as Defendants continue to solicit new investors and obtain new money.

28.    To create the appearance of legitimacy, Bianco and Burkholz give prospective investors elaborate private placement memoranda, subscription agreements, and operating agreements.  These documents claim that Defendants will actively manage the victims' money in

investment funds that primarily use securities options and hedging strategies, aided by an algorithm or other proprietary investment selection criteria, to earn profits.

29.     Defendants Palm Management and Shore Management, acting through Bianco and Burkholz, purport to act as the funds' managers and unregistered investment advisers. The fund materials and related communications that they distribute to investors claim that Palm Management will be compensated through a monthly .167 percent fee (two percent annually), although this is sometimes waived, as well as through various percentages of investment gains, while Shore Management's compensation is purportedly derived only from various percentages of investment gains.

30.     Many of Defendants' investor victims are senior citizens between the ages of 65 and 100, including several Florida small-business owners. At least some have liquidated their retirement savings and other assets to invest with Defendants. Based on Defendants' oral and written representations, victims believe that Defendants will invest their money, that they will be entitled to the profits created by positive trading returns, and that they may redeem some or all of their money on reasonable notice. To transfer their funds to Defendants, most investors wrote checks from personal accounts, small-business checking accounts, or investment trust accounts. More than 25 such checks included notations such as "investment."

31.     Contrary to their claims, Defendants do not profitably invest victim assets. Instead, Bianco and Burkholz knowingly channel new money in three ways: to pay other investors purported profits or redemptions; to pay themselves; and to invest the money in a calamitous trading strategy that has incurred years of material, undisclosed losses.

32.     For example, in early 2019, Bianco and Burkholz, on behalf of Palm Management and Shore Management, solicited Investors 1 and 2 to invest in the Shore Fund by claiming that

8

they operated legitimate investment funds and advisory companies and, in a March 2, 2019 email, by providing materially false historical results (including "Return on Investment" or "ROI") for the Shore Fund. Defendants represented that the Shore Fund had a "34.4% ROI" in the last half of 2018 and a "26.3% ROI" through February 2019, when, in fact, the fund actually **lost** 55% of its value between July 1, 2018 and February 28, 2019. Unaware of this fact, and after signing subscription agreements, Investors 1 and 2 each wired Palm Management $25,000 in March and April 2019, respectively. They expected the money to be invested as Defendants represented in written and oral communications.

33.     Instead, on March 21 and 22, 2019, Bianco and Burkholz used a portion of Investor 1's money to pay Neil Burkholz LLC and Frank Bianco Inc. $5,000 each for unexplained "research;" to pay an earlier Palm Management investor a $5,000 "redemption" on March 26, 2019; and to give $5,000 ten days later to an individual with whom they shared office space. The rest of Investor 1's money remained in the Palm Management checking account, where Bianco and Burkholz used it for a variety of expenses, including still more payments to other investors. Defendants used Investor 2's money to make at least $14,200 in "redemption" payments to four earlier investors on April 9 and 15, 2019; withdrew $5,000 in cash on April 11; and paid the remainder to Frank Bianco Inc. and Neil Burkholz LLC for "research."

34.     Defendants Bianco, Burkholz, and Shore Management thus misappropriated virtually all of Investor 1's and 2's money, yet Bianco provided them with weekly updates in which he and Burkholz claimed that Investors 1 and 2 were invested in the Shore Fund and that the value of their investments had increased dramatically. These representations were false.

35.     As but one example, on August 16, 2019, Bianco emailed Investor 1 and Investor 2, carbon copying Burkholz, a "Swing Trading Report," which he claimed was "a weekly update

of the Fund performance and your account balance so you can measure our progress against the

S&P 500." This report, like others, was signed "Cordially, Frank Bianco and Neil Burkholz." In

the August 16 report, Bianco and Burkholz falsely claimed that Investor 1 and Investor 2 each

had a "3.141% position" in the Shore Fund equal to "$43,505."

36.     Contrary to the Defendants' false reports, they never placed either of these

investors' money in a brokerage account. Rather, as described above, Bianco and Burkholz

spent almost all of these investors' money months before they sent the report. Moreover, as a

result of the significant undisclosed trading losses, a position of "3.141%" in the Shore Fund's

brokerage account in August 2019 would have been equal to just over $8,000, not "$43,505."

37.     Bianco and Burkholz, by and through Shore Management and Palm Management,

have knowingly engaged in this same type of fraudulent and deceptive misconduct for years.

38.     For example, on August 1, 2018, Investor 3 wrote a $130,000 check to Palm

Management from home sale proceeds, noting that the check was his "house closing

investment." On August 8, 2018, Bianco and Burkholz deposited Investor 3's funds into Palm

Management bank account -4900, which only had a balance of $157 before the deposit.

Between August 9 and September 4, 2018, Bianco and Burkholz, acting by and through Palm

Management, used Investor 3's funds to make payments of $80,700 to seven earlier Palm

Management investors. They also used the money to pay Neil Burkholz LLC and Frank Bianco

Inc. $10,000 each for "research" and to pay $1,200 for Palm Management's office rent.

39.     Other examples abound. On September 17, 2018, the balance in Palm

Management's checking account -4900 was only $2,715. That day, Investor 5 transferred

$40,000 to the Defendants believing that it would initially be invested in the Palm Fund and then

moved to the Shore Fund. Investor 5's money never made it into a brokerage account. Rather,

between September 20 and October 2, 2018, Bianco and Burkholz, acting by and through Palm

Management, fraudulently and deceptively used the entire $40,000 to pay purported investment

returns and redemptions to five other Palm Management investors and to pay Palm

Management's rent.

40.     Nonetheless, Bianco and Burkholz repeatedly and falsely told Investor 5 that his

money was profitably invested – first in the Palm Fund and, after purported 2019 transfers, in the

Shore Fund.  As but one example, in an August 24, 2019 "Shore Partners Report" Bianco

emailed to Investor 5 and two other victims, Bianco and Burkholz – who both signed the report –

falsely claimed that the assets in the Shore Fund included "$84,322" in "YTD Funding" from

Investor 5.  In fact, Investor 5's money never made it into the Shore Fund brokerage account and

could not have "funded" the Shore Fund.

41.     Still other examples of this fraudulent and deceptive conduct further reveal the

extent to which Defendants are knowingly operating a Ponzi scheme.  On October 10, 2017,

Investor 4 transferred $249,000 to Palm Management via a check noting the funds were related

to a "401K investment."  Bianco and Burkholz never transferred Investor 4's money to a

brokerage account nor invested it in any way.  Rather, by October 16, 2017, Bianco and

Burkholz had used Investor 4's funds to pay $200,000 to a business associate, to pay Neil

Burkholz LLC and Frank Bianco Inc. $5,000 each for "research," to pay Investor 8 a $13,000

"redemption," and to pay Investor 6 a $20,000 "redemption."

### *Defendants Have Incurred Huge Trading Losses but Continue to Tell Victims That the Palm Fund and the Shore Fund Have Enjoyed Outsized Positive Returns*

42.     To the extent that Defendants have performed any actual trading at all on behalf

of investors, they routinely incur huge trading losses.  To conceal the losses and the previously

described misappropriation of investor assets, Bianco and Burkholz, acting on behalf of Palm

Management and Shore Management, regularly make and send materially false investment reports to investors.  In these reports, Bianco and Burkholz knowingly misrepresent positive investment returns and account balances in the funds they manage to hide the payments made to other investors, themselves, their related entities, and Relief Defendants.

43.     For example, of the approximately $664,480 in investor funds that Bianco and Burkholz deposited in the Shore Fund brokerage account -1244 from May 1, 2018 through June 30, 2019, about $239,439 was lost in 14 months – a net decline of over 41%.

44.     On July 25, 2019, Bianco and Burkholz transferred the remaining funds from brokerage account -1244 to a new Shore Fund brokerage account, -0732, where, after realizing some gains in July 2019, the account lost over 50% of its value in August 2019 through fruitless trading.

45.     Despite these losses, Bianco falsely told victims that the Shore Fund experienced continuous, outsized gains.  For example, Bianco emailed investment reports dated May 4, 11, 18, 25 and June 1, 2019 to Investor 7, a Shore Fund investor and one of this fraud's biggest victims.  In those reports, carbon copying Burkholz, Bianco claimed that the Shore Fund experienced weekly gains in May of 6.3%, 2.6%, 7.7%, 6.7%, and 3.2%, and that the assets in the fund increased from $795,768 to $1,101,582 over the same period.

46.     In reality, the only Shore Fund brokerage account in use at that time, -1244, **lost** approximately 50% of its value in May 2019, ending that month with a net liquidation value of only $335,353.

47.     Similarly, on August 31, 2019, Bianco sent an email to Investors 5 and 7 in which he claimed that the Shore Fund has achieved a year to date "109.3% ROI."  Bianco sent a separate email the same day to Investors 1 and 2 making the same false claim.  In truth, between

January 1 and August 31, 2019, the Shore Management brokerage account -1244 (and its successor -0732) **lost** approximately 48% of its starting value and net monies received.

48.     In the email to Investors 5 and 7, Bianco also stated that he and Burkholz had withdrawn $196,000 in "Fees" even though they were only entitled to fees if the Shore Fund achieved substantial positive returns.  In fact, Bianco and Burkholz knew that the Shore Fund brokerage account actually incurred substantial losses during the weeks and months leading up to the August 31, 2019 email.

49.     Bianco and Burkholz have repeatedly misled investors about investment losses in the Palm Fund for years as well.

50.     In March 2015, for example, the Palm Management brokerage account sustained almost $800,000 in trading losses, about 54% of its value.  After these losses, the brokerage account – which held pooled assets from several investors – had a total value of $677,850. Nonetheless, Burkholz and Bianco sent Investor 8 a fabricated investment report that showed a 2.31% return for March 2015, and claimed that her principal investment of $788,000 had grown to $967,232.  As the fund managers, Defendants knew that this exceeded the actual balance of the Palm Management brokerage account by almost $290,000.

51.     Nevertheless, Defendants Bianco, Burkholz, and Palm Management continued to knowingly send Palm Fund investors false reports.  The following chart reflects the returns Bianco and Burkholz reported to Palm Fund investors as a group, including Investors 5 and 8, versus actual returns for the period August 2015 through August 2016:

| Month | Reported Returns | Actual Returns |
|-------|------------------|----------------|
| 8/2015 | -1.06% | -62.65% |
| 9/2015 | 1.68% | -43.08% |
| 10/2015 | 1.81% | -30.48% |
| 11/2015 | 2.12% | -4.05% |
| 12/2015 | 2.21% | 6.59% |
| 1/2016 | -1.47% | -114.27%[1] |
| 2/2016 | 1.82% | -29.18% |
| 3/2016 | 1.57% | -61.73% |
| 4/2016 | 1.69% | -17.98% |
| 5/2016 | 2.46% | 5.33% |
| 6/2016 | 2.02% | -8.46% |
| 7/2016 | 1.98% | 0% (no trading) |
| 8/2016 | 1.52% | 0% (no trading) |

52.     As but one example of the foregoing false reports, on August 10, 2016, Burkholz

sent the Palm Fund July 2016 Report to 25 individuals, including 20 individuals who combined

had invested approximately $2.3 million as of that date.  Burkholz and Bianco co-signed the

report, which reflected the false returns set forth in the chart above from January through July

2016, and further stated "[a]fter completing seven months, our Fund has gained 10.46% in

2016."  Burkholz and Bianco knew that their representations to investors in this report were

materially false.

53.     In truth, the Palm Fund brokerage account incurred significant losses from

January to June 2016 followed by no trading – and thus no trading gains – in July 2016 at all.  At

the end of July 2016, the account balance was only $4,381.

54.     Notwithstanding the massive losses, Burkholz and Bianco's July 2016 report

further falsely stated:

> The 'consistent gain strategy' we utilize at Palm Financial Fund is
> reflected in our results.  Our hybrid strategy incorporates the safety of a
> mutual fund with the trading strategy of a hedge fund to consistently

---

[1] During January 2016, the account received new deposits, which during the month were completely lost
through trading, resulting in a monthly loss exceeding the opening account value and thus greater than
100%.

14

> produce above average gains. . . . Our 'all-direction' system continues to prove itself in up markets and down markets, usually producing superior results.

Burkholz and Bianco knew that these representations to investors were also materially false.

55.     Bianco and Burkholz have continued to send such false reports to Palm Fund investors through recent months.  For example, following investment losses and withdrawals, the Palm Fund brokerage account -5095 has held only $203 since June 2018.  Notwithstanding this near total depletion and complete lack of trading for the last 16 months, Burkholz and Bianco reported to Investor 6 the following returns for the Palm Fund for the period July 2018 through June 2019:

| Month | Reported Return | Actual Return |
| --- | --- | --- |
| 7/2018 | 2.60% | 0% |
| 8/2018 | 2.18% | 0% |
| 9/2018 | 1.87% | 0% |
| 10/2018 | -1.73% | 0% |
| 11/2018 | 1.01% | 0% |
| 12/2018 | -1.49% | 0% |
| 1/2019 | 3.32% | 0% |
| 2/2019 | 2.17% | 0% |
| 3/2019 | 2.29% | 0% |
| 4/2019 | 2.84% | 0% |
| 5/2019 | -1.91% | 0% |
| 6/2019 | 3.01% | 0% |

56.     Further, in a July 19, 2019 email, Burkholz told Investor 6 that he still had $49,837 invested in the Palm Fund as of June 30, 2019, and that the Palm Fund's "twelve month trailing gain was 17.17%."  Defendants knew that their statements to Investor 6 were false because, as noted above, the Palm Fund brokerage account they manage has held only $203 from June 2018 through the present.

15

57.     As a result of these undisclosed losses, and as described above, Defendants have been forced to use other investors' assets to pay investors that wish to redeem some of their purported earnings – the hallmark of a classic Ponzi scheme.

58.     Investor 6 is a case in point.  At various times since 2017, Investor 6 has sought to withdraw approximately $10,000 to $15,000 of his investment to pay for expenses, including bills related to hurricane damage. In response to these requests, Bianco and Burkholz imposed significant delays.  When they have finally honored Investor 6's redemption requests, they have repeatedly paid him with new money that they solicited from other investors. As discussed above, on October 16, 2017, Bianco and Burkholz diverted $20,000 of Investor 4's money to meet Investor 6's redemption request, and on August 13, 2018, they misappropriated $10,000 from Investor 3 to make another redemption payment to Investor 6.

### *Defendants Engage in a Variety of Additional Deceptive Acts to Discourage Investors from Making Withdrawals*

59.     To perpetuate their scheme, Defendants employ a variety of methods to discourage withdrawals.  As described above, these include providing redemption payments drawn from other investors' money and sending false investment reports intended to reassure investors that their assets continue to grow.

60.     For certain key investors, however, Defendants engage in more elaborate efforts. Investor 8, who has given over $1,000,000 to Bianco, Burkholz and the Palm Defendants, has received periodic redemption payments of approximately $10,000 to $15,000 nearly every month since January 2015, purportedly drawn exclusively from the trading profits on her investment. In fact, Defendants frequently made those redemption payments with money they received from other investors.

16

61.     More recently, Bianco, Burkholz, and Shore Management have solicited and lulled investors into their scheme by providing them the ability to view, in real-time, the Shore Fund brokerage accounts -1244 or -0732 in which their assets purportedly sit.  While superficially reassuring, this innovation in their scheme rests on two fundamental deceptions.

62.     First, Bianco and Burkholz have separately told at least two different groups of investors that the money they can see in the Shore Fund brokerage account is theirs alone, except to the extent Bianco and Burkholz have themselves invested.  For example, in an August 16, 2019 email, Bianco told Investors 1 and 2 that the money in the account was 6.282% theirs and "93.719%" the "manager's position."

63.     In truth, Defendants knew that according to bank and brokerage records, the assets in the Shore Fund brokerage account came primarily from Investor 7 and his son.  This deceptive tactic allowed Bianco and Burkholz to conceal their misuse and diversion of Investor 1's and 2's assets, which never reached a Palm Fund or Shore Fund brokerage account.

64.     The second deception concerns the amount of assets in the Shore Fund brokerage account.  The Shore Fund brokerage account statements contain information about both a "total account value" and a "cash value."  The "cash value" figure does not account for the open securities positions in the account, which can act as both assets and liabilities.  The "total account value" is the net liquidation value of the brokerage account when all of these assets and liabilities are netted out – in other words, how much the account is really worth.  Because the "cash value" figure does not include liabilities in the account, it is often much larger than the net liquidation value.

65.     For example, the July 2019 Shore Fund brokerage account -1244 summary showed a cash value of $1,345,988 while the total account value – in other words, the account's net liquidation value, calculated as assets minus liabilities – was only $430,705.

66.     Defendants Bianco and Burkholz, acting also by and through Shore Management, have repeatedly and exclusively cited the "cash value" figure to Shore Fund investors, both verbally and in weekly email reports.  In these knowingly fraudulent reports, they also used the "cash value" figure, not the actual account value, to calculate purported investment returns.

67.     For example, in the August 24, 2019 "Shore Partners Report" that Bianco emailed to Investors 5 and 7 with a copy to Burkholz, Bianco made no mention of the actual account value, instead noting only the "account cash balance" of $1,349,517, which he then used to calculate weekly, monthly and annual returns.  To reinforce investors' understanding that the "cash value" figure is the actual value of the fund, Bianco stated in the August 24th email that the **"year to date gain for investors is $615,845 (108.0% ROI)."** (Emphasis in original.)

68.     In fact, at the end of July 2019, Defendants knew that the Shore Fund brokerage account's actual value – its net liquidation value– was only $430,705, a figure that fell to only $255,997 by August 31, 2019 and $160,396 a month later.   Defendants' false claims about the value of the Shore Fund brokerage account concealed these losses.

69.     In communications with the Shore Fund investors that can view the Shore Fund brokerage account online, when directly asked about the discrepancy, Bianco and Burkholz have falsely stated that the real value of the account is the "cash value" figure, and that the "total account value" figure is a result of the brokerage firm's error.

70.    This deceptive tactic has had the desired effect.  Until recently, investors in the Shore Fund (including Investors 1 and 2, who thought they were invested in the Shore Fund) believed the "cash value" represented the actual value of the brokerage account.

71.    In late August 2019, Investor 7 sought to redeem his entire investment in the Shore Fund.  Because Bianco, Burkholz, and Shore Management led him to believe all but approximately $80,000 of the assets in the Shore Fund brokerage account (Investor 5's supposed position) were his, Investor 7 thought his stake had grown to the "cash value" figure of roughly $1.3 million.  In fact, as a result of trading losses, the Shore Fund was worth only $255,997 at the end of August 2019 – a drop in the actual account value of nearly $180,000 in just four weeks.

72.    To avoid revealing his fraud, Bianco resisted Investor 7's redemption request.  He sought to pacify Investor 7 by telling him that he would be able to withdraw $1.3 million cash from the account if Investor 7 agreed to delay his redemption for "six to eight weeks."  As discussed further below, Defendants Bianco, Burkholz and Shore Management have been unable to fulfill Investor 7's redemption request to date.

### *Defendants Continue To Deceive Investors and Solicit New Victims*

73.    Defendants have raised over $1.4 million in 2019, including at least $769,000 from at least 11 new investors since March 2019.  One new investor, a 70-year old small business owner in South Florida, invested over $123,000 with Palm Management as recently as September 2019.  Other new investors have also made payments to the Palm Fund, the Shore Fund, and Wiles Systems, a new entity that Bianco and Burkholz have incorporated into their scheme.  In addition, Bianco and Burkholz have opened at least two new brokerage accounts in May and July 2019 to continue their fraud, including one under the name of Wiles Systems, into which they have deposited at least six investors' money.  Defendants have also continued to

19

make knowingly fraudulent redemption payments to earlier investors and continue to solicit more funds from existing investors.

74.     For example, in a September 21, 2019 email to Investors 5 and 7, carbon copying Burkholz, Bianco again sought to reassure Investors 5 and 7 that the Shore Fund would "reach our target of $1,345,000 around Oct 31st."  In that email, however, Bianco suggested that absent additional funds from Investor 7, he may not reach the $1.345 million target.  Bianco complained that he had counted on additional cash contributions from Investor 7, and that, because Bianco, Burkholz and Shore Management "do not have the proper capital to trade," they "could use $200,000 to <u>insure</u> [*sic*] the desired outcome, resume growth, and get Net Liquidity over $1 million." (emphasis in original).

75.     In that email, Bianco also stated that they deposited $197,000 of their own money into the Shore Fund to improve liquidity, when in fact Defendants knew that they simply transferred other investors' money: $100,000 from the Wiles Systems account, and $97,000 from the new, 70-year-old Palm Management investor discussed above.  Bianco and Burkholz used the rest of that new September 2019 investment – $25,000 – to satisfy a redemption request from Investor 1.

76.     During a call on October 2, 2019, Bianco again asked Investor 7 for another $200,000.  Investor 7 stated that such a request was inconsistent with Bianco's prior representations about the Shore Fund's value.  Bianco subsequently admitted to Investor 7 that, absent additional investor contributions, the fund would be "worthless."

77.     Despite Investor 7's unfulfilled redemption request, in October 2019, Bianco and Burkholz continued to siphon investor money from the Shore Fund brokerage account.  For example, Burkholz diverted $5,000 to himself and then transferred $4,800 to his wife for a

purported "office expense." They also paid over $28,000 in redemptions to investors in the Palm Fund and Wiles Systems from Shore Fund investor assets.

### *Burkholz and Bianco Have Misappropriated Investors' Funds to Enrich Themselves and Their Wives*

78.     Bianco and Burkholz misappropriated approximately $880,000 of investor funds by reimbursing themselves and transferring proceeds of their fraudulent scheme to their spouses. Palm Fund documents entitled Palm Management to take, in some cases, only two percent of annual assets under management – pro-rated monthly – as a fee, along with a percentage of positive investment returns. For the Shore Fund, Bianco and Burkholz agreed that Shore Management's only compensation would be a percentage of the positive returns, to be taken only on returns that exceeded 10 percent annually.

79.     From February 2014 through May 2019, Bianco and Burkholz wrote themselves, or their eponymous companies, Frank Bianco Inc. and Neil Burkholz LLC, more than 120 checks from investor funds.

80.     In total, Bianco and Frank Bianco Inc. took at least $436,048 in investor funds between January 2014 and September 2019. Burkholz and Neil Burkholz LLC took at least $433,041 in investor funds during this same period. Both took more in October. Even had they not obtained investor money through misrepresentations and deceptive conduct, the money they took as fees vastly exceeds the two percent to which they were, at most, entitled as managers of the Palm Fund. Further, in light of their substantial trading losses, Defendants were entitled to little, if any, performance-based compensation.

81.     Between 2014 and 2019, Bianco and Burkholz each subsequently paid substantial portions of these investor funds to their wives, Relief Defendants Suzanne Bianco and Rhoda

Burkholz, respectively.  Suzanne Bianco unjustly received at least $55,727 from Frank Bianco

Inc. and Rhoda Burkholz received at least $157,564 from Neil Burkholz LLC.

82.     These payments to the Relief Defendants represent proceeds of the Defendants'

fraudulent scheme alleged herein and, because Relief Defendants were not entitled to those

funds, are subject to disgorgement.

### FIRST CLAIM FOR RELIEF

#### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act
(Against All Defendants)

83.     The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint

as if fully set forth herein.

84.     By engaging in the conduct described above, Defendants knowingly or recklessly,

in connection with the purchase or sale of securities, directly or indirectly, by use of the means or

instrumentalities of interstate commerce: employed devices, schemes or artifices to defraud; and

engaged in acts, practices or courses of business which operated or would operate as a fraud or

deceit upon any person in connection with the purchase or sale of any security, by using new

investor money to pay previous investors (Paragraphs 31, 33, 37 - 41, 57 - 60, 75, 77) by

purporting to operate as legitimate companies while in fact operating as a Ponzi scheme

(Paragraphs 27-82), and by creating and distributing false account statements (Paragraphs  32, 34

- 36, 40, 42 - 56, 66 - 68).

85.     By engaging in the foregoing misconduct, Defendants violated, and unless

enjoined will continue to violate, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)] and

Rule 10b-5(a) and (c) [17C.F.R. § 240.10b-5(a), (c)] thereunder.

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act
**(Against All Defendants)**

86.     The Commission repeats and realleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

87.     By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce: made untrue statements of material facts or omitted to state material facts necessary in order make the statements made, in light of the circumstances they were made, not misleading, by misrepresenting to investors the use, value and performance of their assets (Paragraphs 31 – 60, 66 – 69, 75, 77).

88.     By engaging in the foregoing misconduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)] and Rule 10b-5(b)  [17C.F.R. § 240.10b-5(b)] thereunder.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment
**(Against All Relief Defendants)**

89.     The Commission realleges and incorporates by reference the allegations in Paragraphs 1 through 82, as if they were fully set forth herein.

90.     Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

91.     As described above, Relief Defendants received investor funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' unlawful activities, as alleged in paragraphs 1 through 82 above, and Relief Defendants have no legitimate claims to those proceeds and gave no consideration for exchange of those funds.

92.     Relief Defendants obtained the funds and assets as part of and in furtherance of the securities violations alleged in paragraphs 1 through 82 above and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and assets.  As a consequence, Relief Defendants were unjustly enriched.

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court find Defendants committed the violations alleged, and grant the following relief:

### I.

### **Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction**

Issue a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction restraining and enjoining Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and a Temporary Restraining Order enjoining Defendants from soliciting, accepting, or depositing any monies obtained from actual or prospective investors pending the resolution of this action.

### II.

### **Disgorgement and Prejudgment Interest**

Issue an Order directing Defendants and Relief Defendants to disgorge all profits or proceeds received from investors as a result of the misrepresentations, acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

### III.

### Civil Money Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78(d)].

### IV.

### Asset Freeze

Enter an Order freezing the assets of the Defendants and Relief Defendants, until further Order of this Court.

### V.

### Sworn Accounting

Enter an Order directing Defendants and Relief Defendants to file with this Court and serve upon the Commission, within three (3) business days, a sworn accounting of all assets and liabilities, including all monies and real property directly or indirectly received from investors and all uses of investor funds.

### VI.

### Preservation of Evidence

Enter an Order preventing Defendants and Relief Defendants from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents, books and records.

### VII.

### Expedited Discovery

Enter an Order authorizing expedited discovery.

## VIII.

### Order to Show Cause

Enter an Order directing Defendants and Relief Defendants to show cause why the Order restraining their conduct should not be converted into a permanent injunction.

### Demand for Jury Trial

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: November 4, 2019

Respectfully submitted,

By: _____

Daniel Maher
Assistant Chief Litigation Counsel
S.D. Fla. No. A5502597
Direct Dial: (202) 551-4737
Email:  maherd@sec.gov
***Lead Attorney to be Noticed***

Brianna Ripa
Senior Counsel
S.D. Fla. No. A5502598
Direct Dial: (202) 551-7585
Email: ripab@sec.gov
***Attorney to be Noticed***

Attorneys for Plaintiff
**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION**
100 F Street NE
Washington, DC 20549

OF COUNSEL:

Jan M. Folena
Amy L. Friedman
Carolyn M. Welshhans
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549